# In the United States Court of Appeals
# for the District of Columbia Circuit

### No. 23-1334

_____

INDUSTRIAL ENERGY CONSUMERS OF AMERICA, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

**BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

_____

Matthew R. Christiansen
  General Counsel

Robert H. Solomon
  Solicitor

Jason T. Perkins
  Attorney
  jason.perkins@ferc.gov

For Respondent
Federal Energy Regulatory
  Commission
Washington, D.C. 20426

FINAL BRIEF: JUNE 21, 2024

# CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.    Parties

The parties that have appeared before the Court are listed in

Petitioners' Rule 28(a)(1) certificate.

### B.    Rulings Under Review

**1.** *ITC Midwest, LLC*, Order on Transmission Rate Incentive, 184

FERC ¶ 61,083 (Aug. 8, 2023) ("Incentive Order"), R. 15, JA176-195.

**2.** *ITC Midwest, LLC*, Notice of Denial of Rehearing by Operation

of Law and Providing for Further Consideration, 185 FERC ¶ 62,013

(Oct. 10, 2023), R. 18, JA232.

**3.** *ITC Midwest, LLC*, Order Addressing Arguments Raised on

Rehearing, 185 FERC ¶ 61,123 (Nov. 16, 2023) ("Rehearing Order"),

R. 19, JA233-250.

### C.    Related Cases

This case has not previously been before this Court or any other

court.  The petition in *Resale Power Group of Iowa v. FERC* (D.C. Cir.

No. 16-1088), currently held in abeyance (following briefing) pending

further Commission proceedings, challenges a different and distinct set

of Commission orders issued in 2015 and 2016 that granted company-

wide transmission rate incentives to intervenor ITC Midwest, LLC.

_/s/ Jason T. Perkins_
Jason T. Perkins
Attorney

# TABLE OF CONTENTS

Introduction and Statement of the Issue .............................................. 1

Counterstatement on Jurisdiction ...................................................... 5

Statutory and Regulatory Provisions .................................................. 6

Statement of Facts ....................................................................... 6

I.    Statutory and Regulatory Background ...................................... 6

    A.    The Federal Power Act ...................................................... 6

    B.    Transmission Incentives ................................................... 7

        1.    Section 219 of the Federal Power Act and the 2006 Incentives Rule ................................................. 7

        2.    The Abandonment Incentive ................................... 9

II.    The Commission Proceedings ................................................. 11

    A.    ITC Midwest's Request .................................................... 11

    B.    Customers' Protest .......................................................... 13

    C.    The Commission Orders on Review ................................. 14

        1.    The Incentive Order .............................................. 14

        2.    The Rehearing Order .............................................. 16

Summary of Argument ..................................................................... 19

Argument ..................................................................................... 20

I. Standard of Review ................................................................. 20

II. The Commission Reasonably Refused to Delay or Deny
an Abandonment Incentive Because of Pending State Court
Litigation... ............................................................................. 22

    A. Customers' Concerns About Project Assignment and
    the Iowa Litigation Pertain to Prudence and Are Not
    Yet Ripe for Resolution ................................................. 24

        1. The Commission Will Address Prudence Issues,
        If Necessary, in a Later Proceeding ........................ 25

        2. Ratemaking Concerns Related to the Iowa
        Litigation Are Therefore Not Yet Ripe for
        Resolution ................................................................. 28

    B. The Commission Reasonably Applied Its 2006
    Incentives Rule and Past Commission Precedent ........... 30

        1. The Commission Reasonably Focused on the
        Incentives Rule's Requirements ............................. 30

            a. Legal Uncertainty is Not Dispositive ............ 30

            b. Customers' Preoccupation with Pending
            State Court Litigation is Misplaced .............. 32

        2. The Commission Reasonably Applied Past Agency
        Precedent on Legal Uncertainty ............................. 35

        3. The Commission Reasonably Explained Why
        Prudence Objections Were Premature ................... 37

    C. The Timing of the Incentive Order Was Appropriate ..... 40

III. The Commission Reasonably Granted an Abandonment
     Incentive Here………................................................ 42

     A.    The Commission's Determination was Based on
           Substantial Evidence of the Project's Risks and
           Challenges...................................................... 42

     B.    Customers' Contrary Arguments Are Wrong.................. 45

Conclusion ........................................................ 49

# TABLE OF AUTHORITIES

## COURT CASES:

*Ameren Servs. Co. v. FERC*,
    893 F.3d 786 (D.C. Cir. 2018)............................................. 29, 34

*Coal. of MISO Transmission Customers v. FERC*,
    45 F.4th 1004 (D.C. Cir. 2022).......................................20, 21, 48

*Conn. Dep't of Pub. Util. Control v. FERC*,
    593 F.3d 30 (D.C. Cir. 2010) ...................................................... 7

*Devia v. NRC*,
    492 F.3d 421 (D.C. Cir. 2007)..................................................... 29

*Entergy Arkansas, LLC v. FERC*,
    40 F.4th 689 (D.C. Cir. 2022)............................................... 20-21

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................ 21

*FERC v. Elec. Power Supply Ass'n*,
    577 U.S. 260 (2016) .................................................. 6, 20, 20-21

*FPC v. Transcon. Gas Pipe Line Corp.*,
    423 U.S. 326 (1976) ........................................................... 40, 41

*Fla. Gas Transmission Co. v. FERC*,
    604 F.3d 636 (D.C. Cir. 2010).................................................... 44

*Fla. Mun. Power Agency v. FERC*,
    315 F.3d 362 (D.C. Cir. 2003).......................................22, 40, 44

*Flint Hills Res. Alaska, LLC v. FERC*,
    627 F.3d 881 (D.C. Cir. 2010).................................................... 29

*Int'l Transmission Co. v. FERC,*
    988 F.3d 471 (D.C. Cir. 2021).................................................. 21

*John Doe, Inc v. Drug Enf't Admin.,*
    484 F.3d 561 (D.C. Cir. 2007).................................................. 27

*La. Pub. Serv. Comm'n v. FERC,*
    522 F.3d 378 (D.C. Cir. 2008).................................................. 22

*La. Pub. Serv. Comm'n v. FERC,*
    10 F.4th 839 (D.C. Cir. 2021) .................................................. 21

*La. Pub. Serv. Comm'n v. FERC,*
    20 F.4th 1 (D.C. Cir. 2021) ...................................................... 39

*LS Power Midcontinent, LLC v. State,*
    988 N.W.2d 316 (Iowa 2023) ....................................... 14, 22-23

*Maine Pub. Utils. Comm'n v. FERC,*
    454 F.3d 278 (D.C. Cir. 2006).................................................. 34

*Midwest ISO Transmission Owners v. FERC,*
    373 F.3d 1361 (D.C. Cir. 2004)........................................... 28-29

*MISO Transmission Owners v. FERC,*
    819 F.3d 329 (7th Cir. 2016) ..............................................23, 36

*Missouri Pub. Serv. Comm'n v. FERC,*
    783 F.3d 310 (D.C. Cir. 2015).................................................. 21

*Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.,*
    498 U.S. 211 (1991) ................................................. 21-22, 39, 40

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1,*
    554 U.S. 527 (2008) ................................................................ 6-7

*NextEra Energy Res., LLC v. FERC,*
    898 F.3d 14 (D.C. Cir. 2018) .................................................. 6-7

*N.C. Util. Comm'n v. FERC,*
    741 F.3d 439 (4th Cir. 2014) ................................................. 7, 8

*San Diego Gas & Elec. Co. v. FERC,*
    913 F.3d 127 (D.C. Cir. 2019)....................3, 3-4, 8, 10-11, 11, 26
                      37, 38-39, 44, 46, 48

*Town of Norwood, Mass. v. FERC,*
    80 F.3d 526 (D.C. Cir. 1996) ................................................... 10

*TransCanada Power Mktg. Ltd. v. FERC,*
    811 F.3d 1 (D.C. Cir. 2015) ................................................. 5, 29

## <u>ADMINISTRATIVE CASES:</u>

*Ameren Servs. Co.,*
    135 FERC ¶ 61,142 (2011) ....................................................... 38

*Duquesne Light Co.,*
    184 FERC ¶ 61,018 (2023) ....................................................... 27

*Entergy Services, Inc.,*
    130 FERC ¶ 61,023 (2010) ................................................... 25-26

*GridLiance West Transco LLC,*
    164 FERC ¶ 61,049 (2018) ....................................................... 41

*ITC Midwest, LLC,*
    184 FERC ¶ 61,083 (2023) ("Incentive Order"), *on reh'g,*
    185 FERC ¶ 61,123 (2023) ("Rehearing Order")
    ......................................................... 4-5, 11-20, 23-31, 33-48

*Kanstar Transmission, LLC,*
    152 FERC ¶ 61,209 (2015) ................................................... 47-48

*Mid-Atlantic Interstate Transmission, LLC,*
    166 FERC ¶ 61,075 (2019) ....................................................... 40

*Midcontinent Indep. Sys. Operator, Inc.,*
 182 FERC ¶ 61,039 (2023) (*"Great River Energy"*).............. 46-47

*Midcontinent Indep. Sys. Operator, Inc.,*
 184 FERC ¶ 61,040 (2023) (*"Republic"*)............................. 35, 36

*NextEra Energy Transmission Southwest, LLC,*
 178 FERC ¶ 61,082 (2022) ...................................................... 37

*NextEra Energy Transmission Southwest, LLC,*
 180 FERC ¶ 61,032 (2022) (*"NextEra"*)...................16, 35, 36, 41

*New Eng. Power Co.,*
 42 FERC ¶ 61,016 (1988) ........................................................ 10

*Pioneer Transmission, LLC,*
 126 FERC ¶ 61,281 (2009) ...................................................... 16

*PJM Interconnection, L.L.C.,*
 164 FERC ¶ 61,015 (2018) ...................................................... 11

*Potomac-Appalachian Transmission Highline, LLC,*
 158 FERC ¶ 61,050 (2017) ...................................................... 25

*Potomac Edison, Co.,*
 165 FERC ¶ 61,168 (2018) ...................................................... 41

*Promoting Transmission Investment through Pricing Reform,*
 Order No. 679, 116 FERC ¶ 61,057 (2006) ("Incentives Rule"),
 *on reh'g,* Order No. 679-A, 117 FERC ¶ 61,345 (2006)
 ...........................3, 7-11, 26-27, 30-31, 33-34, 36-40, 41-44, 48

*Promoting Transmission Investment through Pricing Reform,*
 Policy Statement, 141 FERC ¶ 61,129 (2012) ............. 8-9, 17, 47

*Southern Cal. Edison Co.,*
 161 FERC ¶ 61,107 (2017) ................................................. 47-48

*TransCanyon DCR, LLC,*
    152 FERC ¶ 61,017 (2015) ............................................. 36-37, 44

*Transource Kansas, LLC,*
    151 FERC ¶ 61,010 (2015), *on reh'g,*
    154 FERC ¶ 61,011 (2016) .................................................. 36-37

## STATUTES:

Administrative Procedure Act
    5 U.S.C. § 706(2)(A) .................................................................... 20

Federal Power Act
    Section 201, 16 U.S.C. § 824 ...................................................... 6

    Section 205, 16 U.S.C. § 824d ............................................... 6, 11

    Section 219, 16 U.S.C. § 824s.................................3, 7, 30, 45-46

    Section 313, 16 U.S.C. § 825*l* .............................................22, 44

## REGULATIONS:

    18 C.F.R. § 35.35(d) ................................................................ 3, 8

# GLOSSARY

| | |
|---|---|
| Br. | Opening brief of petitioning Customers |
| Commission or FERC | Federal Energy Regulatory Commission |
| Customers | Petitioners Industrial Energy Consumers of America, Resale Power Group of Iowa, the Coalition of MISO Transmission Customers, and the Wisconsin Industrial Energy Group |
| Incentive Order | *ITC Midwest, LLC*, Order on Transmission Rate Incentive, 184 FERC ¶ 61,083 (Aug. 8, 2023), R. 15, JA176-195 |
| Incentives Rule | *Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057 (2006), *on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007) |
| ITC Midwest | Intervenor for Respondent ITC Midwest, LLC |
| Midcontinent | Midcontinent Independent System Operator, Inc. |
| Policy Statement | *Promoting Transmission Investment Through Pricing Reform*, Policy Statement, 141 FERC ¶ 61,129 (2012) |
| Project | The Iowa portion of the Skunk River to Ipava 345 kilovolt transmission project, assigned by Midcontinent to ITC Midwest in 2022 |
| Rehearing Order | *ITC Midwest, LLC*, Order Addressing Arguments Raised on Rehearing, 185 FERC ¶ 61,123 (2023), R. 19, JA233-250 |

# In the United States Court of Appeals
## for the District of Columbia Circuit

### No. 23-1334

———————

INDUSTRIAL ENERGY CONSUMERS OF AMERICA, *ET AL.*,
*Petitioners*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————

ON PETITION FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

———————

## INTRODUCTION AND STATEMENT OF THE ISSUE

In this case, ITC Midwest, LLC (ITC Midwest) applied for, and the

Federal Energy Regulatory Commission (Commission or FERC)

granted, a particular type of conditional incentive rate treatment should

a particular electric transmission line that ITC Midwest is developing

be "abandoned" through no fault of ITC Midwest. The purpose of this

"abandonment" incentive is to encourage the development of beneficial

transmission projects, in furtherance of a 2005 amendment to the Federal Power Act and an implementing 2006 Commission rulemaking.

Here, ITC Midwest's regional grid operator, Midcontinent Independent System Operator, Inc. (Midcontinent), directed ITC Midwest to build the Iowa portion of the Skunk River to Ipava 345 kilovolt electric transmission project (Project). The Project will more reliably connect different parts of the electric grid. It will also require numerous regulatory approvals that could be denied or challenged in litigation.

As the Commission has recognized for years, required governmental approvals pose a risk to project development and cost recovery. That is because, in general, a new transmission infrastructure project must be successfully completed and placed in service before a utility can include that project's costs in its transmission rates. In many cases, if a project is abandoned (i.e., canceled), only a portion of the prudently-incurred costs of such projects can be recovered from customers through rates.

But there is a type of ratemaking assurance under the Federal Power Act that utilities can apply for regarding certain projects.

In the proceedings at issue here, ITC Midwest applied for and received an "abandonment incentive" under section 219 of the Act, 16 U.S.C. § 824s.  *See generally San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127 (D.C. Cir. 2019).  This incentive helps assure that utilities can recover in their rates all of the costs that they prudently incur in pursuing certain beneficial transmission projects that meet statutory criteria. *See* 18 C.F.R. § 35.35(d)(1)(vi).  In 2006's Order No. 679 (the Incentives Rule), the Commission established the abandonment incentive; it also provided that utilities would be able to request assurance in advance that a particular project would later qualify for full instead of partial cost recovery, if abandoned for reasons outside of the utility's control.[1]

Receiving that assurance is, however, only the first step toward cost recovery.  If a project with an abandonment incentive is later canceled, the utility must return to the Commission and demonstrate that it acted prudently.  *See San Diego*, 913 F.3d at 132-34, 140

---

[1] *Promoting Transmission Investment through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, at PP 28, 76-80, 155-167 (2006), *on reh'g*, Order No. 679-A, 117 FERC ¶ 61,345 (2006), *on reh'g*, Order No. 679-B, 119 FERC ¶ 61,062 (2007).

(describing the "two-step" Commission process for abandoned plant cost recovery).

The orders on review here were issued at the first or "assurance" step of the abandonment incentive process. The Commission found that the Project's regulatory risks justified granting an abandonment incentive. *See ITC Midwest, LLC*, Order on Transmission Rate Incentive, 184 FERC ¶ 61,083, at PP 43-48 (Aug. 8, 2023) (Incentive Order), R. 15, JA191-194. The petitioning group of electric customers (collectively, Customers)[2] sought rehearing. They argued that ITC Midwest's request should be delayed or denied because of specific litigation pending in Iowa state court that may undermine the Project's assignment to ITC Midwest. The Commission rejected these claims; it explained that uncertainty over developments in state law does not render the Project ineligible for incentives. *ITC Midwest, LLC*, Order Addressing Arguments Raised on Rehearing, 185 FERC ¶ 61,123, at

---

[2] The petitioners here are the Industrial Energy Consumers of America, Resale Power Group of Iowa, the Coalition of MISO Transmission Customers, and the Wisconsin Industrial Energy Group. The Commission orders on review refer to petitioners, collectively, as the "Consumer Alliance."

PP 32-38 (Nov. 16, 2023) (Rehearing Order), R. 19, JA244-248.

The Commission deferred to a later proceeding any inquiry into the

prudence of ITC Midwest's decision-making.

*The issue presented for review is:* Whether the Commission

reasonably granted ITC Midwest's incentive request consistent with

agency rules and policy, and with substantial evidence in the record.

## COUNTERSTATEMENT ON JURISDICTION

As discussed in Argument section II(A), *infra* pp. 24-30,

petitioning Customers appear eager to dispute a rate filing that ITC

Midwest has not yet made. To the extent Customers believe that the

ongoing Iowa state court litigation has dispositive significance for

Project-related cost recovery purposes, their arguments are directed at

the prudence of ITC Midwest's decision-making and are not yet ripe for

resolution. This Court therefore may, as a prudential matter, defer any

consideration of the eventual ratemaking significance of the Iowa state

court litigation until after the Commission explores those issues.

*See TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 9 (D.C. Cir.

2015) (finding that arguments about mere conceptual issues or

uncertain economic costs were "not yet ripe" (citations omitted)).

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes and regulations are contained in the attached Addendum.

## STATEMENT OF FACTS

## I. STATUTORY AND REGULATORY BACKGROUND

### A. The Federal Power Act

Under the Federal Power Act, the Commission has exclusive jurisdiction over the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce. 16 U.S.C. §§ 824(a)-(d). Under section 205 of the Federal Power Act, all rates for or in connection with jurisdictional sales and transmission service are subject to Commission review to assure that they are just and reasonable, and not unduly discriminatory or preferential. 16 U.S.C. §§ 824d(a)-(e); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 277 (2016).

Because "'just and reasonable' is obviously incapable of precise judicial definition," the Commission's determination that a utility's proposal is just and reasonable is afforded "great deference." *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 20 (D.C. Cir. 2018) (quoting

*Morgan Stanley Cap. Grp. Inc. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008)).

**B.    Transmission Incentives**

**1.    Section 219 of the Federal Power Act and the 2006 Incentives Rule**

In 2005, Congress passed the Energy Policy Act to, among other things, increase transmission efficiency and innovation.  *See N.C. Util. Comm'n v. FERC*, 741 F.3d 439, 443 (4th Cir. 2014) (citing Pub. L. 109-58, 119 Stat. 594 (2005)).  As part of that legislation, Congress added section 219 to the Federal Power Act.  *See id.*; 16 U.S.C. § 824s.

Section 219(a) directs the Commission to establish, by rule, incentive-based rate treatments for transmission infrastructure. 16 U.S.C. § 824s(a).  The purpose of such incentives, Congress established, was to "benefit[] consumers by ensuring reliability and . . . reducing transmission congestion."  *Id.*  In 2006 the Commission issued the Incentives Rule, known as Order No. 679, to comply with and give effect to that command.  *See* 116 FERC ¶ 61,057; *see also Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30, 33 (D.C. Cir. 2010) (discussing the Incentives Rule and Federal Power Act section 219).

The Incentives Rule and its implementing regulation did not automatically grant any incentive or recovery of any particular costs. *See* 18 C.F.R. § 35.35(d); *San Diego*, 913 F.3d at 139-40. Rather, a utility must justify its specific incentive request with a three-part showing. It must show: (1) that the transmission project either promotes reliability or reduces transmission congestion; (2) that there is a nexus between the incentive being sought and the anticipated investment; and (3) that the resulting rates will be (as the Federal Power Act requires) just and reasonable. Incentives Rule, 116 FERC ¶ 61,057 at P 76; *see also id.* PP 6, 48. In short, the incentives must be "tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project." 18 C.F.R. § 35.35(d); *see also N.C. Util. Comm'n*, 741 F.3d at 443-445 (discussing nexus test).

The Commission thus requires both case-by-case adjudication and a fact-specific nexus to ensure that incentives benefit consumers by encouraging new and beneficial transmission investment. *See* Incentives Rule, 116 FERC ¶ 61,057 at PP 6, 43, 76; *id.* P 21 (finding that such an approach would adequately balance consumer and investor interests); *see also Promoting Transmission Investment Through Pricing*

*Reform*, Policy Statement, 141 FERC ¶ 61,129, at PP 6-10 (2012) (Policy Statement) (discussing the nexus test and announcing that the Commission would "analyze the need for each individual incentive, and the total package of incentives," in case-by-case adjudication applying the Incentives Rule).

## 2. The Abandonment Incentive

Even where transmission projects are needed and would be beneficial, utilities may encounter significant risks to project development that stem from factors beyond their control.  As the Incentives Rule observed, such risks can include the decisions of third-parties such as generation developers, or "difficulty obtaining state or local siting approvals" from the relevant authorities.  Incentives Rule, 116 FERC ¶ 61,057 at P 155.  Where they materialize, those risks may lead to cancellation or abandonment of a project despite the prudent efforts of the utility.  *See id.*

These problems are of course not new, and so, for decades, the Commission has allowed utilities to share the costs of abandoned facilities with their customers.  As a baseline, a utility may propose to recover 50 percent of the costs of an abandoned project from its

customers, with the utility (i.e., its shareholders) taking responsibility for the remaining 50 percent. *See New Eng. Power Co.*, Opinion No. 295, 42 FERC ¶ 61,016, at 61,081-82 (1988) (adopting an "explicit 50-50 sharing of the loss"), *on reh'g*, Opinion No. 295-A, 43 FERC ¶ 61,285 (1988); *see also Town of Norwood, Mass. v. FERC*, 80 F.3d 526, 529, 531-32 (D.C. Cir. 1996) (noting that Opinion No. 295 limits recovery for abandoned facilities to 50 percent of prudently-incurred investments).

The 2006 Incentives Rule built upon and extended that precedent in creating today's abandonment incentive. The Rule allows utilities that satisfy the three-part showing above to seek recovery of up to 100 percent of the prudently-incurred costs of an abandoned transmission project if the abandonment is outside the utility's control. Incentives Rule, 116 FERC ¶ 61,057 at PP 76, 156, 163. The Commission noted that although it qualifies as an "incentive" under the Federal Power Act, the abandonment incentive "is perhaps more properly characterized as reducing a regulatory barrier" that the ratemaking process may present to infrastructure development. *Id.* P 28.

As noted above, utilities typically follow a "two-step" process in securing an abandonment incentive, where eligibility for the incentive

is determined before a specific rate increase may later be proposed. *See San Diego*, 913 F.3d at 133, 139-40. Although the first step in this process is not typically subject to prescribed statutory deadlines, the Commission has committed to act on such filings within 60 days or as soon as possible. *See* Incentives Rule, 116 FERC ¶ 61,057 at P 77.

The "timing of [an] . . . order matters" in this context for at least two reasons: because granting the incentive reduces potential risk premiums on capital investment that may eventually be paid by customers; and because only those costs prudently incurred after the issuance of an incentive order are eligible for the abandonment incentive. *See San Diego*, 913 F.3d at 137-39; *see also PJM Interconnection, L.L.C.*, 164 FERC ¶ 61,015 at PP 7-11 (2018) (explaining timing of Incentives Rule and Opinion No. 295 policies).

## II. THE COMMISSION PROCEEDINGS

### A. ITC Midwest's Request

On May 30, 2023, ITC Midwest submitted an abandonment incentive request for the Project under section 205 of the Federal Power Act (16 U.S.C. § 824d), the 2006 Incentives Rule, and the 2012 Policy Statement. Incentive Order P 1, JA176. It explained that the Project is one element of a set of Midcontinent transmission projects that are

expected to address dozens of unique reliability violations, increase transmission capacity, and relieve thermal and voltage constraints across Iowa, Illinois, Missouri, Indiana, and Michigan (as outlined in the map below). *Id.* P 3, JA177; Incentive Request at 3, 5, R. 1, JA9, 11. ITC Midwest indicated that it will own and construct the Iowa portion of the Skunk River to Ipava Project, which was selected for development through Midcontinent's regional transmission planning process. Incentive Request at 1-3, 4-5, JA7-9, 10-11.



Figure 6-12: East-Central Corridor (Iowa to Michigan) Final Solution

*Id.* Ex. 1, Attach. A at 2, 40, R. 1, JA36, 71; *see also* Customers' Protest at Ex. A, Facility Table p. 6 (providing data on Project segments to be

located in Iowa under project "13"), R. 10, JA105.

ITC Midwest further explained that development of the Project presents particular regulatory and environmental risks and challenges, especially regarding federal, state, and local regulatory approvals and authorizations. Incentive Request at 6, JA12. In submitted testimony, ITC Midwest's director of planning, Jeffrey Eddy, identified more than a dozen types of government approvals and compliance activities necessitated by the Project as well as corollary financial risks. *See id.* Ex. 1 at 8-11, JA26-29. Mr. Eddy noted that such permits and regulatory approvals may be subject to legal challenge, and that ITC Midwest has experienced increased opposition to large infrastructure projects from landowners and other stakeholders. *Id.* Ex. 1 at 9-10, JA27-28. Given these circumstances, ITC Midwest requested that the Commission grant the abandonment incentive effective as of July 30, 2023. Incentive Order P 5, JA178.

## B. Customers' Protest

Customers protested ITC Midwest's filing, contending in part that the "questionable legality" of an Iowa statute that relates to transmission development counseled in favor of denying the request.

*Id.* P 44, JA192; Customers' Protest at 1-2, 11-13, R. 10, JA75-76, 85-87.

Customers noted that the Iowa Supreme Court had halted enforcement

of section 478.16 of the Iowa Code while a state constitutional challenge

brought by ITC Midwest's competitors proceeded to the merits.  Protest

at 9-13, JA83-87; *see also LS Power Midcontinent, LLC v. State*, 988

N.W.2d 316, 333-35, 340 (Iowa 2023), *reh'g denied* (Apr. 26, 2023); Iowa

Code Ann. § 478.16 (West 2022).  According to Customers, the

importance of that litigation "cannot be overstated" since ITC Midwest

could not demonstrate that Project development "is free and clear of any

legal impediments."  Protest at 12-13, JA86-87.  This "legal cloud" led

Customers to be skeptical that "the incurrence of costs by ITC Midwest"

could be "considered prudent."  *Id.*

C. **The Commission Orders on Review**

1. **The Incentive Order**

On August 8, 2023, 70 days after submission of ITC Midwest's

request, *see* Incentive Order P 1, JA176, the Commission found that

ITC Midwest had demonstrated that the Project faces regulatory,

environmental, and siting risks that are beyond ITC Midwest's control

and could lead to the Project's abandonment.  It therefore found that

ITC Midwest had demonstrated a nexus between the requested incentive and planned investment in the Project. *Id.* P 43, JA192.

The Commission also explained why the Iowa litigation did not have as much importance as protesting Customers believed: the mere presence of regulatory or litigation uncertainty (including potential future changes to state law) does not preclude the Commission from evaluating or granting a request under the Incentives Rule. *See id.* P 44 & n.77 (collecting cases), JA192. And the Commission made clear that its abandonment incentive findings did not prejudge any potential prudence challenges that may arise later; that is, the Incentive Order by its express terms was not a determination that any Project costs ITC Midwest actually incurs are prudent. *Id.* PP 45, 48, JA192-193, 194.

The Commission therefore granted ITC Midwest's request, making an abandonment incentive available for 100 percent of the prudently-incurred costs expended on the Project on and after the date of the Incentive Order, August 8, 2023. *Id.* P 48, JA194; Rehearing Order P 10, JA236. One Commissioner dissented, arguing that ITC Midwest's application was premature.

## 2.     The Rehearing Order

*The Rehearing Request.*  Customers timely filed a rehearing

request, arguing that the Commission underappreciated the importance

of the Iowa litigation.  Reh'g Request at 10-13, R. 16, JA205-208.

Customers disputed that agency precedent involving regulatory or

litigation uncertainty supported the Incentive Order.  *Id.* at 16-18,

JA211-213; Rehearing Order P 29 & nn.55, 58 (citing *NextEra Energy*

*Transmission Southwest, LLC*, 180 FERC ¶ 61,032 (2022), and *Pioneer*

*Transmission, LLC*, 126 FERC ¶ 61,281 (2009)), JA243.  Customers also

accused the Commission of finding Project costs prudent *per se*, Reh'g

Request at 13, JA208, and of failing to identify and explain record

evidence supporting the incentive grant, *see id.* at 23-27, JA218-222;

Rehearing Order PP 13-16, JA237-238.

Additionally, Customers requested that the Commission "clarify"

that an unfavorable result in the Iowa litigation was not "beyond the

control" of ITC Midwest and thus could not constitute grounds for

Project abandonment consistent with the granted incentive.  Reh'g

Request at 28-29, JA223-224.

*The Rehearing Order.* On rehearing, the Commission sustained the result of the Incentive Order and denied clarification. It explained that ITC Midwest's expert testimony supported finding a nexus between its requested incentive and its planned investment, given the numerous required Project approvals and associated risks. Rehearing Order PP 17-19, JA238-239. Consistent with the 2012 Policy Statement, approval risks such as these can warrant granting an abandonment incentive. *Id.* P 18 & n.32 (citing Policy Statement, 141 FERC ¶ 61,129 at P 14), JA238-239. These risks can also have a financial impact. *See id.* P 21, JA240.

The Commission further explained why the Iowa litigation did not foreclose an abandonment incentive for the Project. The Commission understood Customers to be asking for an alternative analysis or departure from agency precedent. That is, ITC Midwest would have to go beyond the Incentives Rule's requirements to also show that potential legal uncertainties regarding the Project have already been resolved. *See id.* PP 34, 37, JA245, 246-247. The Commission explained that such an additional showing would not be justified since legal uncertainties—even those related to state laws about transmission

project development, as identified in prior agency precedent—are not incompatible with the forward-looking abandonment incentive. *See id.* The Incentives Rule requires findings about a project's risks and challenges, but it does not require "that a developer provide absolute assurance that it will remain responsible for a project prior to awarding incentive rate treatment." *Id.* P 37, JA247.

Because litigation outcomes remained uncertain and are beyond ITC Midwest's managerial control, the Commission denied Customers' request for clarification. *See id.* PP 35, 41, JA246, 249. The Commission repeatedly emphasized that its decision on the abandonment incentive did not prejudge the outcome of any future hypothetical cost recovery proceeding. *Id.* PP 36, 41 (citing Incentive Order P 48, JA194), JA246, 249.

The Commission also explained that it was not premature to act on ITC Midwest's request in a timely fashion. *See id.* PP 35, 38, JA246, 247-248. Rather, where no specific deadline for agency action applies, the Commission has discretion to decide when the administrative record is sufficient to support an order. *See id.* P 38 & n.79 (collecting cases), JA248. One Commissioner again dissented.

## SUMMARY OF ARGUMENT

This case is about the Commission's reasonable application of its Incentives Rule. All of the relevant parties are before the Court—the utility that requested an incentive, the Commission that granted it, and the Customers who objected. This case presents straightforward questions of administrative law; chiefly, whether the Commission's grant of an abandonment incentive here was reasonably explained and based on substantial record evidence. Customers' various other concerns about the Project are either not germane to this case or not yet ripe for resolution.

On the merits, although Customers fill their opening brief with accusations that the Commission failed to "consider" or "engage" with their arguments or "account for" their concerns (*see*, *e.g.*, Br. 3-4, 5, 9-10, 31, 37, 42, 45), the Commission's orders addressed all of their claims. The Commission found that regulatory or litigation uncertainty does not preclude granting an incentive request. It explained that past agency precedent tolerated uncertainty about potential future legal developments. In sum, "legal uncertainties are not incompatible" with

the abandonment incentive.  Rehearing Order P 37, JA247.  Customers

provide no sound reason to disturb that conclusion.

Furthermore, the Commission based its incentive eligibility

findings on substantial record evidence.  Record testimony established

the Project's need for numerous regulatory approvals, which present a

significant risk to Project development and cost recovery, and the

Commission reasonably explained its conclusions.  Customers'

remaining concerns about Project-related ratemaking issues may be

raised in later proceedings.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Court reviews Commission decisions under the

Administrative Procedure Act's narrow arbitrary and capricious

standard.  5 U.S.C. § 706(2)(A); *FERC v. Elec. Power Supply Ass'n*, 577

U.S. 260, 292 (2016).  Under that standard, the question is not "whether

a regulatory decision is the best one possible or even whether it is better

than the alternatives."  *Elec. Power Supply Ass'n*, 577 U.S. at 292*; see

also Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004,

1017 (D.C. Cir. 2022) (same).  The Court does not "determine [whether]

'FERC made the better call,' rather, [its] 'important but limited role is

to ensure . . . reasoned decisionmaking.'" *Entergy Arkansas, LLC v. FERC*, 40 F.4th 689, 701-02 (D.C. Cir. 2022) (quoting *Elec. Power Supply Ass'n*, 577 U.S. at 295).

Indeed, the Commission's determination will be upheld "as long as it has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *Coal. of MISO Transmission Customers*, 45 F.4th at 1017 (citation omitted); *see also Int'l Transmission Co. v. FERC*, 988 F.3d 471, 480 (D.C. Cir. 2021) (noting that review of rate-related determinations is "particularly deferential"). In short, judicial review ends if the Commission's decision was reasonable and reasonably explained. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (collecting cases).

In addition, the Court defers to the Commission's reasonable interpretation of its own precedent. *La. Pub. Serv. Comm'n v. FERC*, 10 F.4th 839, 845 (D.C. Cir. 2021); *see also Missouri Pub. Serv. Comm'n v. FERC*, 783 F.3d 310, 316, 319 (D.C. Cir. 2015) (deferring to Commission analysis where "Commission precedent amply supports the challenged orders"). It also defers to the Commission's broad discretion

regarding agency procedures and priorities. *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991).

Finally, the Commission's factual findings are conclusive if supported by substantial record evidence. *See* 16 U.S.C. § 825*l*(b). Substantial evidence "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 395 (D.C. Cir. 2008) (citation omitted). Even where the evidence could reasonably support another conclusion, all the Court asks is whether there is record evidence that supports FERC's conclusion. *See id.* (citing *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003)).

## II.  THE COMMISSION REASONABLY REFUSED TO DENY OR DELAY AN ABANDONMENT INCENTIVE BECAUSE OF PENDING STATE COURT LITIGATION

As background, in 2023, the Iowa courts halted enforcement of a state law that factored into Midcontinent's assignment of the Project to ITC Midwest in 2022. *See* Br. 28; Incentive Order PP 14, 31 (citing, in part, *LS Power Midcontinent, LLC v. State*,

988 N.W.2d 316 (Iowa 2023)), JA180, 187.[3]  Customers base their

primary argument on the past and present status of this

litigation—asserting that the grant of an abandonment incentive

for the Project is not appropriate given what has occurred in this

particular Iowa state constitutional litigation over a particular

state law.  *See*, *e.g.*, Br. 11, 24, 31, 32, 37.   They even draw the

Court's attention now to state court developments that post-date

the Commission's Rehearing Order.[4]

However, as explained below, most of these concerns are

unripe as they relate to Project cost recovery ratemaking decisions

the Commission has not yet been asked to make.  And the

Commission reasonably explained why the Iowa litigation does not

have the importance that Customers ascribe to it in the incentive

---

[3] *See also MISO Transmission Owners v. FERC*, 819 F.3d 329,
336-37 (7th Cir. 2016) (explaining Midcontinent's approach to state
laws bearing on project assignment).

[4] After the Rehearing Order issued in November 2023, the Iowa
state trial court entered another order in the ongoing litigation in
December 2023, which Customers attach to their opening brief.
*See* Br. at Addendum pp. 13-35.  A notice of appeal has since been filed.
*LS Power Midcontinent, LLC v. State*, Iowa Appellate Court Case No.
24-0641 (filed Apr. 17, 2024).

ratemaking process thus far.  As a result, Customers' primary

argument fails.

A.  **Customers' Concerns About Project Assignment and the Iowa Litigation Pertain to Prudence and Are Not Yet Ripe for Resolution**

As noted above, the Commission orders here were entered at the

first step of the abandonment incentive process, which has concluded.

But in their opening brief, Customers repeatedly express anticipatory

concerns about the second step of the process—the possibility that ITC

Midwest may someday submit an abandonment recovery proposal for

the Project and then recover Project costs from consumers.  *See*, *e.g.*,

Br. 18-19 (granting an abandonment incentive here adopts "a self-

sustaining standard" that will shift all "litigation risk and

corresponding risk of an abandoned plant" to consumers).  In short,

Customers believe that the status of the pending Iowa litigation should

have controlled the Commission's decision-making here, which would

have prevented these unwelcome outcomes.  *See*, *e.g.*, Br. 12, 16, 27.

But critically, this case is about a limited and conditional

ratemaking assurance granted by the Commission under the Federal

Power Act.  This case is not about which utility should build the

assigned transmission project, the validity of any state laws bearing on that question, or the wisdom of any specific steps that ITC Midwest may currently be taking to build the Project. The scope of this appeal is thus narrower than Customers' claims might suggest.

### 1. The Commission Will Address Prudence Issues, If Necessary, in a Later Proceeding

To the extent that Customers give dispositive significance to the status of the Iowa state court litigation in their arguments, their concerns relate to the prudence of ITC Midwest's ongoing Project decision-making and not the abandonment incentive. As the Commission noted, "a prudent expenditure" on utility plant or operations "is one reasonable utility management would have made, in good faith, under the same circumstances, and at the relevant point in time." Rehearing Order P 41 n.84 (cleaned up) (quoting *Potomac-Appalachian Transmission Highline, LLC*, Opinion No. 554, 158 FERC ¶ 61,050, at P 99 (2017)), JA249. This is a highly fact-sensitive inquiry focused on historical circumstances. *See Entergy Services, Inc.*, Opinion No. 505, 130 FERC ¶ 61,023, at P 52 (2010) (prudence inquiry asks "not just whether the utility made a mistake" regarding a certain decision,

but also whether it "fail[ed] to consider the costs and benefits of that action before undertaking it").

The Commission explained here, as it has before, that prudence concerns are taken up in the second proceeding in the two-step Incentives Rule process, after project abandonment occurs and all the relevant facts can be gathered. *See* Incentive Order P 45 ("The Commission will address the prudence of any costs incurred if and when ITC Midwest . . . seek[s] recovery of such costs" in the future), JA192-193; *San Diego*, 913 F.3d at 133-34, 140 (describing Incentives Rule process and citing, in part, 116 FERC ¶ 61,057 at PP 76-79). (In effect, acting prudently is a condition of utility cost recovery pursuant to the abandonment incentive, not a prerequisite for receipt of the incentive in the first place. *See* Incentives Rule, 116 FERC ¶ 61,057 at PP 77-78 (incentive eligibility is adjudicated at the first step of the incentive process).)

Indeed, the Commission did not authorize any cost recovery in the orders under review, nor did it deem any particular Project expenditures prudent or imprudent. Rehearing Order PP 36, 41, JA246, 249. Those subsequent Project cost-related issues would only be

substantively explored, if ever, in the second step of the ratemaking process, the "future hypothetical" proceeding the Commission has refused to prejudge. *Compare id.* P 41, JA249 *with Duquesne Light Co.*, 184 FERC ¶ 61,018, at PP 22-29 (2023) (reviewing cost recovery filings).

Therefore, the Incentive and Rehearing Orders here are final,[5] though only as to ITC Midwest's receipt of the abandonment incentive and the Commission's explanation for granting it. The Orders did not examine state law or explore whether the Project was properly assigned to ITC Midwest. And they do not guarantee that the Commission will find any of ITC Midwest's specific Project-related costs prudently incurred.

---

[5] In the Incentive Order, the Commission found that ITC Midwest was eligible for an abandonment incentive regarding the Project. This conclusion has legal consequences in future Project-related ratemaking proceedings regarding the proportion of prudently-incurred costs that may be recoverable from customers and it cannot be relitigated later. *See* Incentive Order PP 43-44, 48, JA191-192, 194; *see also* Incentives Rule, 116 FERC ¶ 61,057 at PP 20, 77-78 ("whether the applicant's facility qualifies to receive" incentives is determined at the first step and not revisited later); *John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561, 566 (D.C. Cir. 2007) (explaining finality principles). The Commission thus does not challenge Customers' standing, at least regarding the incentive conclusions reached by the Commission.

Customers frequently ignore or confuse these distinctions. They even assert that "FERC has prejudged the prudency" of Project costs and "granted . . . an additional presumption of prudence" to ITC Midwest regarding the Iowa litigation. Br. 39. But the question that seems to animate many of Customers' objections—whether, and to what extent, any specific Project expenditures incurred after August 8, 2023 (the issuance date of the Incentive Order) are prudent and therefore should be charged to customers—has been specifically reserved for that later proceeding. *See* Incentive Order P 48, JA194; Rehearing Order P 41, JA249. Review of Customers' cost recovery concerns can wait until then.

### 2. Ratemaking Concerns Related to the Iowa Litigation Are Therefore Not Yet Ripe for Resolution

As a result, under this Court's ripeness precedents, all that is presented now is a comparatively narrow issue: whether the Commission reasonably applied its Incentives Rule in granting ITC Midwest's incentive request, based on substantial evidence in the record. *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1367-68 & n.2 (D.C. Cir. 2004) (finding issue directly raised by

orders under review ripe, though later cost recovery concerns were not). In essence, the Commission has "approved the concept" of the abandonment incentive here and thereby provided limited ratemaking assurance, but it has not reviewed (and may never need to review) a specific cost recovery proposal or specific Project expenditures. *See TransCanada*, 811 F.3d at 9; *see also id.* (argument about economic costs that were "not yet certain" was "not yet ripe" (citation omitted)); *Ameren Servs. Co. v. FERC*, 893 F.3d 786, 792 (D.C. Cir. 2018) (a claim based on "contingent future events" is unripe (citation omitted)).

As a prudential matter then, review of the specific circumstances surrounding the Iowa litigation and its significance for Project decision-making should be deferred until the facts are fully developed in a later proceeding. *See Flint Hills Res. Alaska, LLC v. FERC*, 627 F.3d 881, 889 (D.C. Cir. 2010) (collecting ripeness cases, including *Devia v. NRC*, 492 F.3d 421 (D.C. Cir. 2007)); *see also infra* pp. 39-40 (agency receives procedural deference in handling related, yet discrete issues). Customers would not face any hardship—the Commission explicitly stated that they may raise prudence challenges in a later proceeding. *See* Rehearing Order P 41, JA249; Incentive Order P 48, JA194.

Indeed, Customers have pledged to do so in any such proceeding. *See* Customers' Protest at 13 (noting intent to challenge recovery of "*any* costs" incurred during Iowa litigation), R. 10, JA87.

As explained below, the Commission provided a reasonable explanation for its decision not to afford the pending Iowa state court litigation controlling significance in finding the Project eligible for incentive treatment. For present purposes, that is all that the Court needs to consider in this appeal regarding the Iowa litigation.

### B. The Commission Reasonably Applied Its 2006 Incentives Rule and Past Commission Precedent

#### 1. The Commission Reasonably Focused on the Incentives Rule's Requirements

##### a. Legal Uncertainty is Not Dispositive

As explained in the Incentive Order now on review, section 219 of the Federal Power Act, 16 U.S.C. § 824s, added in 2005, directed the Commission to establish, by rule, incentive-based rate treatments to promote capital investment in electric transmission infrastructure. Incentive Order P 10, JA179. The Commission's 2006 Incentives Rule, together with its 2012 Policy Statement, detail the Commission process that an applicant follows to receive incentives under the Act. *Id.* PP 10-13, JA179-180. This includes a "fact-specific" demonstration "that there

is a nexus between the incentive sought and the investment being made." *Id*. P 12, JA179-180. And that nexus test is met when the incentives requested are appropriately tailored to the "demonstrable risks or challenges faced by the applicant." *Id*. (quoting in part, Order No. 679-A, 117 FERC ¶ 61,345 at P 27), JA179.

The Commission decided here that ITC Midwest had demonstrated a nexus between its requested incentive and planned investment, given the Project-specific regulatory, environmental, and siting risks detailed in the record. *Id*. P 43, JA192. Utilities may well face additional "regulatory or litigation uncertainty," but such uncertainties do not prevent the Commission from applying the Incentives Rule to a request. *Id*. P 44, JA192. Such problems are generally beyond a utility's control, as the Incentives Rule recognizes regarding a utility's inability to obtain required governmental approvals. *See* 116 FERC ¶ 61,057 at PP 155, 163-166; *see also* Rehearing Order P 35 (finding that the ultimate outcome of pending litigation is "beyond ITC Midwest's control"), JA246.

### b. Customers' Preoccupation with Pending State Court Litigation is Misplaced

Customers' principal argument is that the Commission was wrong to focus on the requirements of the Incentives Rule. Instead, Customers argue, the Commission was required to base its incentives decision on "the effectiveness of the legal authority assigning the Project to ITC Midwest" and whether that past assignment was "free from legal challenge" under state law. *See* Br. 24, 29; *see also supra* pp. 22-23 (noting fact of Iowa state court litigation). Customers thus assert that the grant of an abandonment incentive is not appropriate here. Br. 11-12, 31-32, 33, 37-38.

But, of course, the Commission plays no role in deciding whether an Iowa state statute violates the Iowa Constitution. The Commission was not tasked with weighing federal interests against state interests in this proceeding. And it did not directly or indirectly intervene in any state court litigation. Customers' repeated suggestions to the contrary are misplaced. *See, e.g.,* Br. 13, 16, 32 & n.3.

Customers try to repackage these concerns under the guise of the Administrative Procedure Act—they accuse the Commission of failing to "engage" with their arguments, *see, e.g.,* Br. 3-4, 31, 37, and of failing to

explain how the orders on review are "compatible with the facts" in the record, Br. 30, 36-37. The Incentive Order and Rehearing Order, however, bely these claims. The Commission understood and responded to Customers' arguments. It simply "disagree[d] that ITC Midwest's request should be denied based on the pendency of litigation challenging" the Iowa statute. Incentive Order P 44, JA192.

The Commission explained that agreeing with Customers' argument would require "an alternative analysis or departure from Commission precedent," since the Incentives Rule process tolerates uncertainty regarding the future. *See* Rehearing Order PP 33-34, JA244-245. ITC Midwest was not required to remove all doubt about the Project before applying for incentives. *See id.* P 37, JA247. While it could and did establish that the Project required numerous governmental approvals that could be denied or later set aside, *id.* PP 18, 33 n.64, JA238-239, 244-245, ITC Midwest did not *also* have to prove to the Commission that other state laws and policies bearing on those approvals were fixed and certain, *see id.* P 37, JA246-247.

As the Commission found, "all applicants in [incentive] proceedings are faced with a risk that developments in state law could

cast doubt on their respective rights to develop the project" in question. *Id.* P 37, JA247. While they are not themselves a reason to grant the abandonment incentive, these "legal uncertainties are not incompatible" with the abandonment incentive either. *Id.*

Furthermore, nothing that Customers raised necessarily meant that the Project would have to be abandoned—only ITC Midwest could lay claim to the Project, and the ultimate outcome and effect of the Iowa litigation "remain[ed] uncertain" and was "beyond ITC Midwest's control." *Id.* PP 34-35, JA245-246. All this—and the Commission precedent discussed below—counseled in favor of sustaining the abandonment incentive here. *Id.* PP 32-38, JA244-248.

Customers simply disagree with that conclusion, despite receiving a reasonable explanation for it. Accordingly, their petition for review should be denied. *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 795 (D.C. Cir. 2018) (the fact of a petitioner's disagreement with a conclusion "does not render the Commission's explanation any less thorough or reasoned"); *see also Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 287, 289 (D.C. Cir. 2006) (incentive decisions "involve matters of rate design . . . at the core of FERC's regulatory responsibilities").

## 2. The Commission Reasonably Applied Past Agency Precedent on Legal Uncertainty

As explained in the Rehearing Order, several past abandonment incentive orders further supported the Commission's action here. Rehearing Order P 37, JA246-247. In one case, the Commission found that concern about possible litigation over a new state statute did not prevent granting an abandonment incentive. *See id.* (discussing *Midcontinent Indep. Sys. Operator, Inc.*, 184 FERC ¶ 61,040, at PP 16, 20 (2023) (*Republic*)), JA246-247. In another, the risk of changes to state law by the state legislature similarly did not prevent the grant of an abandonment incentive. *See id.* (discussing *NextEra*, 180 FERC ¶ 61,032 at P 8), JA247. Both arose in the context of potential state law developments that may affect the assignment of transmission projects. *See id.*, JA246-247. And taken together, these cases indicated that "the Commission has never required that a developer provide absolute assurance that it will remain responsible for a project prior to awarding incentive rate treatment." *Id.*, JA247.

Customers contend that such absolute assurance is required. They believe that incentives are improper unless Project development is "free from legal challenge." *See* Br. 11-12, 29, 30.

This is not consistent with past Commission precedent, including

*Republic* and *NextEra*. Like ITC Midwest, those requesting utilities

had been assigned the project in question but had yet to secure multiple

types of required approvals. *See Republic*, 184 FERC ¶ 61,040 at PP 2,

15-16, 20 (noting project cancellation risks regarding future permits

and approvals, and uncertainty regarding state laws); *NextEra*, 180

FERC ¶ 61,032 at PP 6-8, 18 (same). Potential changes to state law did

not render those requests premature or suspect. Rehearing Order P 37,

JA246-247. The Commission decided that the same was true here. *Id.*

Also, as in other incentive proceedings, the Commission in this

proceeding did not decide who should build the Project. *Cf. MISO*

*Transmission Owners v. FERC*, 819 F.3d 329, 336-37 (7th Cir. 2016)

(denying petition for review and explaining Midcontinent's approach to

state laws bearing on project assignment). Regarding incentives, a

utility applicant can submit its Incentives Rule request before or after

receiving a project assignment, as long as it has identified a specific

project. *See, e.g., TransCanyon DCR, LLC*, 152 FERC ¶ 61,017, at PP 4,

41 (2015) (granting the prospective project developer an abandonment

incentive "*if* it is selected as the approved project sponsor" in a

competitive process (emphasis added)); *Transource Kansas, LLC*, 151

FERC ¶ 61,010, at PP 6, 34 (2015) (denying incentive request because

utility failed to identify "a particular transmission project" for the

Commission to consider), *on reh'g*, 154 FERC ¶ 61,011, at P 11 (2016).[6]

Whether Midcontinent correctly assigned the Project to ITC

Midwest in 2022 before the Iowa Supreme Court decision in 2023 was

simply not at issue in the proceedings here.  Customers thus

misapprehend the relationship between project assignment and the

abandonment incentive, as the Commission reasonably explained.

*See* Rehearing Order P 37, JA246-247.

### 3. The Commission Reasonably Explained Why Prudence Objections Were Premature

Customers further assert that in rejecting their claims, "FERC

has prejudged the prudency" of Project costs and "granted . . .

---

[6] This especially makes sense where multiple utilities are competing for specific projects, since transmission incentives may affect the costs of a proposal that a utility submits into a competitive solicitation or a utility's subsequent financing options. *Cf. San Diego*, 913 F.3d at 138 (describing relationship between abandonment risk and cost of capital); *NextEra Energy Transmission Southwest, LLC*, 178 FERC ¶ 61,082, at P 12 (2022) (noting the utility applicant's interest in an abandonment incentive was in part because it "will help attract financing for" its project by reducing risks).

an additional presumption of prudence" to ITC Midwest. Br. 39.
In their reading, by granting an incentive despite uncertainty, the
Incentive Order also rendered a *per se* judgment on the prudence of
Project costs and foreclosed future arguments to the contrary.
*See* Br. 39; Rehearing Order P 36 (citing Reh'g Request at 13, JA208),
JA246.

The Commission squarely addressed these claims and explained
why they were misplaced and premature. *See* Incentive Order P 45
(explaining that the incentive determination "is not a determination
that any costs . . . actually incur[red] . . . are prudent"), JA192;
Rehearing Order PP 36, 41 (same), JA246, 249. It has repeatedly
explained that under the two-step process for abandonment incentive
requests invoked here, the second proceeding provides the appropriate
forum for prudence challenges. *See* Incentive Order P 45 ("The
Commission will address the prudence of any costs incurred if and when
ITC Midwest . . . seek[s] recovery of such costs" in the future), JA192-
193; *id.* P 48 (same), JA194; Rehearing Order PP 10, 36, 41, JA236, 246,
249; *see also Ameren Servs. Co.*, 135 FERC ¶ 61,142, at P 61 (2011)
(same); *San Diego*, 913 F.3d at 140 (describing Incentives Rule process

and citing 116 FERC ¶ 61,057 at PP 76-79).  That forum will be available to Customers before any abandonment cost recovery is granted, though such a proceeding is merely a "future hypothetical" now.  Rehearing Order P 41, JA249; *see also* ITC Midwest Answer to Protest at 3, 10 (acknowledging that an Incentives Rule abandonment incentive provides "the *opportunity* to recover 100% of costs subject to a [Federal Power Act] Section 205 filing demonstrating that costs were prudently incurred"), R. 12, JA149, 156.

This conclusion was reasonable and reasonably applied the Incentives Rule.  The Commission "enjoys broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities."  *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991) (citations omitted). It "need not solve every problem before it in the same proceeding." *Id.* at 231; *see also La. Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021) (rejecting a petitioner's procedural argument and citing *Mobil Oil*, 498 U.S. at 230).  The Incentives Rule established that "any rate concerns" are best addressed in proceedings that specifically explore those issues.  *See* 116 FERC ¶ 61,057 at PP 43, 166.  Here, the

Commission did not err by declining to reach an issue that may be fully explored later but was premature and not yet presented by the record. *See* Rehearing Order PP 36, 41, JA246, 249; *see also Mid-Atlantic Interstate Transmission, LLC*, 166 FERC ¶ 61,075, at P 22 (2019) (noting that the "authorizations in this order leave unaddressed any prudence issues" that "may arise" later).

### C. The Timing of the Incentive Order Was Appropriate

Customers also assert that, given the status of the Iowa litigation, the Commission erred by taking only 70 days to act on ITC Midwest's incentive request. Br. 24-27. The Commission, according to Customers, should have either prolonged its consideration of ITC Midwest's request or told ITC Midwest to try again later. Br. 27.

But, in the absence of statute-imposed deadlines and commitments, the Commission is in control of its own calendar and procedures. Rehearing Order P 38 & n.79 (collecting cases, including *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333-34 (1976)), JA248. It has broad discretion in prioritizing its work and managing its dockets. *Mobil Oil*, 498 U.S. at 230; *Fla. Mun. Power Agency*, 315 F.3d at 366. Since the record was complete and ready for

decision, the Commission did not misapply its discretion in providing a timely ruling. *See* Rehearing Order PP 17-19, 34-35, 38, JA238-239, 245-246, 248; *see also Transcontinental*, 423 U.S. at 333-34 ("the methods, procedures, and time dimension of the needed inquiry" are entrusted to the agency).

In fact, Commission policy supports timely action on incentive requests, as explained in the Incentives Rule. *See* 116 FERC ¶ 61,057 at P 77 (indicating that the Commission "will seek to process [requests] quickly" and "strive to meet" a 60-day processing timeline). In the *NextEra* case and others, the Commission has met that goal. *See, e.g.,* 180 FERC ¶ 61,032 at P 1 (decision issued on 60th day); *Potomac Edison Co.*, 165 FERC ¶ 61,168, at P 1 (2018) (same); *GridLiance West Transco LLC*, 164 FERC ¶ 61,049, at P 1 (2018) (same). It provided timely consideration again here. *See* Incentive Order P 1 (noting that the request was submitted May 30, 2023, and the decision issued on August 8, which is 70 days later), JA176.

To be clear, Customers do not doubt the Commission's authority to grant the incentive, nor do they question that the Commission possesses procedural and managerial discretion. *See* Br. 27. Rather, Customers

contend that the circumstances here—the pending Iowa litigation—

*necessitated* that the Commission exercise its discretion in a particular

way, that is, by delaying or denying ITC Midwest's request.  Br. 12, 27,

30.  But Customers read into the Incentives Rule and Commission

precedent extra requirements that do not exist.  *See supra* pp. 33-37.

And the Commission does not need to identify a "compelling" reason to

justify its discretionary docket-management decisions.  *Compare* Br. 25-

27 *with* Rehearing Order PP 35, 38 (Commission did not act

prematurely), JA246, 248.

## III.  THE COMMISSION REASONABLY GRANTED AN ABANDONMENT INCENTIVE HERE

### A.  The Commission's Determination Was Based on Substantial Evidence of the Project's Risks and Challenges

Customers also claim that the Incentive Order was not based on

substantial evidence of the Project's risks and challenges.  Br. 45-46, 49-

51.  In Customers' reading, ITC Midwest failed to identify "any specific

risks and challenges" that would "show a compelling case for

incentives."  Br. 46-47.

This argument ignores the facts in the record.  As the Commission

explained, ITC Midwest's application demonstrated that the Project will

require "numerous federal, state," and other "regulatory approvals," which could be denied, or set aside after litigation. Rehearing Order P 18, JA238-239; *see also* Incentive Order P 17, JA181-182. Indeed, testimony in the record from ITC Midwest's director of planning, Jeffrey Eddy, explained that the Project will need permits under the Clean Water Act, approvals under the Rivers and Harbors Act, a franchise from the state Utilities Board, as well as state land permits and various local and other approvals. Incentives Request Ex. 1 at 8-11, R. 1, JA26-29. Mr. Eddy also reported that ITC Midwest faced "increasingly organized and outspoken" opposition in the state franchising process and increased opposition from landowners and other stakeholders, such that it "anticipates court challenges to awards of permits and other regulatory approvals." *Id.* at 9-10, JA27-28. Mr. Eddy further identified that these risks have a financial dimension as well. *Id.* at 10, JA28.

Applying the 2006 Incentives Rule and the 2012 Policy Statement, the Commission credited ITC Midwest's testimony and explained that the risks Mr. Eddy described warranted an abandonment incentive.

*See* Rehearing Order PP 18-19 & nn.29-32, JA238-239.[7]  The

Commission explained that the Project's regulatory and environmental

risks can result in significant financial risks.  *See id*. P 21, JA240;

*see also San Diego*, 913 F.3d at 139 (explaining the relationship

between greater certainty of "rate-recovery for failed projects" and

"capital availability at lower cost").

This is sufficient.  *See Fla. Mun. Power Agency*, 315 F.3d at 368;

16 U.S.C. § 825*l*(b) ("The finding of the Commission as to the facts, if

supported by substantial evidence, shall be conclusive.").  Customers

offer no basis on which to "second-guess the Commission's technical

judgment" regarding Project risks.  *See Fla. Gas Transmission Co. v.*

*FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010).

---

[7]  *See also TransCanyon*, 152 FERC ¶ 61,017 at PP 27, 41 (granting abandonment incentive given environmental, regulatory, siting, and other risks).  Customers erroneously suggest that other ITC Midwest statements formed the basis of the Commission's evidentiary findings.  *See*, *e.g.*, Br. 14, 44.  The Incentive Order focused on regulatory, environmental, and siting risks, not the additional statements about construction-related issues that Customers highlight.  *See* Incentive Order P 43, JA191-192; Rehearing Order PP 18-21, JA238-240.

**B.    Customers' Contrary Arguments Are Wrong**

Customers offer several unpersuasive variations on their substantial evidence claim.  They contend that Project risks must be "specific/special" and not "generic," and that ITC Midwest thus did not provide "sufficient explanation" of Project risks, especially given that portions of new Project facilities will be located in existing utility easements.  *See* Br. 14-15, 46-49.  In short, they question the risk-reducing purpose of the incentive here and accuse the Commission of failing to demand a heightened factual showing from ITC Midwest. *See* Br. 33-34, 36-38, 40, 50-51.

Contrary to Customers' suggestions, the Commission has not "failed to engage" with or "failed to account for" any of these concerns. *See* Br. 37, 42, 45, 48.  First, the incentive grant here serves a clear and Congressionally-directed purpose—to encourage ITC Midwest, the only utility currently developing the Project, to continue its pursuit of the Project's ratepayer benefits.  *See* Rehearing Order PP 34-35 ("absent capital investment by ITC Midwest, the Project will not advance"), JA245-246; *id.* P 34 n.67 (noting that 16 U.S.C. § 824s(b) directs the Commission to promote capital investment in the enlargement and

improvement of electric transmission facilities), JA245; Incentive Order P 16 (confirming that the Project itself satisfied statutory and regulatory requirements), JA181. The incentive does not provide an open-ended guarantee to ITC Midwest (*contra* Br. 33, 37-38, 42), as it applies only to the prudently-incurred expenses on and after August 8, 2023 (the date of the Incentive Order) that a reasonable utility manager in ITC Midwest's position would have incurred. Incentive Order P 48, JA194; Rehearing Order P 41 & n.84, JA249. This reasonable balance promotes ratepayers' interests. *See San Diego*, 913 F.3d at 138-39.

Second, the fact that the Project will leverage existing rights of way did not eliminate its risks or disqualify ITC Midwest from receiving incentives. Like the developer of another recent project selected by Midcontinent, ITC Midwest must still obtain state and federal approvals (including from the state utility regulator) for the Project, which thus poses financial risks associated with potential abandonment. *See* Rehearing Order P 22 (citing *Midcontinent Indep. Sys. Operator, Inc.*, 182 FERC ¶ 61,039, at PP 7, 27 (2023) (*Great River Energy*) (describing the Big Stone Project in South Dakota and Minnesota)), JA240; *Great River Energy*, 182 FERC ¶ 61,039, at PP 7-

10, 26-28.  More generally, Midcontinent expects that new facilities will be sited in existing rights of way where possible.  ITC Midwest Answer at 13 (citing Incentive Request Ex. 1, Attach. A at 1, R. 1, JA35), R. 12, JA159.

To the extent that Customers believe that the Project is merely "routine" in nature, and thus not worthy of incentives (*see* Br. 46-47), they appeal to an outmoded proxy standard that the Commission disavowed more than a decade ago.  *See* Incentive Order P 46 (citing, in part, 2012 Policy Statement, 141 FERC ¶ 61,129 at P 10), JA193; Rehearing Order P 22 (same), JA240.  The Commission considered this request in a case-specific adjudication, finding that ITC Midwest's requested incentive was appropriately tailored to the Project's risks and challenges.  *See* Rehearing Order PP 18-19, 22, JA238-239, 240; Incentive Order P 46, JA193.  The Eddy Testimony spoke directly to the risks of the Project and the challenges that ITC Midwest expected in pursuing it.  *See* Rehearing Order PP 18-19 & nn.29-31 (relying on Incentives Request Ex. 1 at 8-10, JA26-28), JA238-239.

And where other applicants have fallen short of demonstrating project-specific risks, the Commission has rejected their incentive

requests. *See*, *e.g.*, *Southern Cal. Edison Co.*, 161 FERC ¶ 61,107, at PP 20, 24-26 (2017) (denying incentive for electric substation replacement where state regulator had already granted permit and where many identified risks were within applicant's control), *on reh'g*, 163 FERC ¶ 61,137 (2018); *Kanstar Transmission, LLC,* 152 FERC ¶ 61,209, at PP 7, 31-34 (2015) (denying incentive where the primary risk identified—that the relevant grid operator may find a better solution to the transmission problem—was not project-specific).

The Commission's reasonable exercise of its ratemaking judgment here deserves respect. *See Coal. of MISO Customers*, 45 F.4th at 1017, 1020; *see also San Diego*, 913 F.3d at 142 (denying petition where Commission-granted abandonment incentive was consistent with the Incentives Rule and supported by substantial evidence).

## CONCLUSION

For the foregoing reasons, the petition for review, to the extent

ripe for immediate review, should be denied.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

June 21, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,839 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C. 20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

June 21, 2024

# ADDENDUM

### STATUTES
### AND
### REGULATIONS

# TABLE OF CONTENTS

Administrative Procedure Act

    5 U.S.C. § 706(2)(A) ......................................................... A-1

Federal Power Act

    Section 201, 16 U.S.C. § 824.......................................... A-3

    Section 205, 16 U.S.C. § 824d........................................ A-6

    Section 219, 16 U.S.C. § 824s ........................................ A-9

    Section 313, 16 U.S.C. § 825*l*..................................... A-10

Regulations

    18 C.F.R. § 35.35................................................................ A-12

to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

### Editorial Notes

#### AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the re-

viewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### Statutory Notes and Related Subsidiaries

#### ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same

## (g) Qualifying criteria for closed-loop pumped storage projects

### (1) In general

The Commission shall establish criteria that a pumped storage project shall meet in order to qualify as a closed-loop pumped storage project eligible for the expedited process established under this section.

### (2) Inclusions

In establishing the criteria under paragraph (1), the Commission shall include criteria requiring that the pumped storage project—

(A) cause little to no change to existing surface and ground water flows and uses; and

(B) is unlikely to adversely affect species listed as a threatened species or endangered species under the Endangered Species Act of 1973 [16 U.S.C. 1531 et seq.].

## (h) Savings clause

Nothing in this section affects any authority of the Commission to license a closed-loop pumped storage project under this subchapter.

(June 10, 1920, ch. 285, pt. I, § 35, as added Pub. L. 115–270, title III, § 3004, Oct. 23, 2018, 132 Stat. 3865.)

### Editorial Notes

#### References in Text

The Fish and Wildlife Coordination Act, referred to in subsec. (c)(2), (3)(A), is act Mar. 10, 1934, ch. 55, 48 Stat. 401, which is classified generally to sections 661 to 666c–1 of this title. For complete classification of this Act to the Code, see section 661(a) of this title, Short Title note set out under section 661 of this title, and Tables.

The National Environmental Policy Act of 1969, referred to in subsec. (e), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Endangered Species Act of 1973, referred to in subsec. (g)(2)(B), is Pub. L. 93–205, Dec. 28, 1973, 87 Stat. 884, which is classified principally to chapter 35 (§ 1531 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1531 of this title and Tables.

## § 823g. Considerations for relicensing terms

### (a) In general

In determining the term of a new license issued when an existing license under this subchapter expires, the Commission shall take into consideration, among other things—

(1) project-related investments by the licensee under the new license; and

(2) project-related investments by the licensee over the term of the existing license.

### (b) Equal weight

The determination of the Commission under subsection (a) shall give equal weight to—

(1) investments by the licensee to implement the new license under this subchapter, including investments relating to redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures required or authorized by the new license; and

(2) investments by the licensee over the term of the existing license (including any terms under annual licenses) that—

(A) resulted in redevelopment, new construction, new capacity, efficiency, modernization, rehabilitation or replacement of major equipment, safety improvements, or environmental, recreation, or other protection, mitigation, or enhancement measures conducted over the term of the existing license; and

(B) were not expressly considered by the Commission as contributing to the length of the existing license term in any order establishing or extending the existing license term.

### (c) Commission determination

At the request of the licensee, the Commission shall make a determination as to whether any planned, ongoing, or completed investment meets the criteria under subsection (b)(2). Any determination under this subsection shall be issued within 60 days following receipt of the licensee's request. When issuing its determination under this subsection, the Commission shall not assess the incremental number of years that the investment may add to the new license term. All such assessment shall occur only as provided in subsection (a).

(June 10, 1920, ch. 285, pt. I, § 36, as added Pub. L. 115–270, title III, § 3005, Oct. 23, 2018, 132 Stat. 3867.)

## SUBCHAPTER II—REGULATION OF ELECTRIC UTILITY COMPANIES ENGAGED IN INTERSTATE COMMERCE

## § 824. Declaration of policy; application of subchapter

### (a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

### (b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted

across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

**(c) Electric energy in interstate commerce**

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

**(d) "Sale of electric energy at wholesale" defined**

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

**(e) "Public utility" defined**

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),[1] 824i, 824j, 824j–1, 824k, 824*o*, 824*o*–1, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

**(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt**

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing act-

ing as such in the course of his official duty, unless such provision makes specific reference thereto.

**(g) Books and records**

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

(A) an electric utility company subject to its regulatory authority under State law,

(B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

(C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A),

wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

(A) preempt applicable State law concerning the provision of records and other information; or

(B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

(June 10, 1920, ch. 285, pt. II, § 201, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 847; amended Pub. L. 95–617, title II, § 204(b), Nov. 9, 1978, 92 Stat. 3140; Pub. L. 102–486, title VII, § 714, Oct. 24, 1992, 106 Stat. 2911; Pub. L. 109–58, title XII, §§ 1277(b)(1), 1291(c), 1295(a), Aug. 8, 2005, 119 Stat. 978, 985; Pub. L. 114–94, div. F, § 61003(b), Dec. 4, 2015, 129 Stat. 1778.)

### Editorial Notes

#### References in Text

The Rural Electrification Act of 1936, referred to in subsec. (f), is act May 20, 1936, ch. 432, 49 Stat. 1363, which is classified generally to chapter 31 (§ 901 et seq.) of Title 7, Agriculture. For complete classification of this Act to the Code, see section 901 of Title 7 and Tables.

The Public Utility Holding Company Act of 2005, referred to in subsec. (g)(5), is subtitle F of title XII of Pub. L. 109–58, Aug. 8, 2005, 119 Stat. 972, which is classified principally to part D (§ 16451 et seq.) of subchapter XII of chapter 149 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 15801 of Title 42 and Tables.

---

[1] So in original. Section 824e of this title does not contain a subsec. (f).

AMENDMENTS

2015—Subsec. (b)(2). Pub. L. 114–94, §61003(b)(1), inserted "824*o*–1," after "824*o*," in two places.

Subsec. (e). Pub. L. 114–94, §61003(b)(2), inserted "824*o*–1," after "824*o*,".

2005—Subsec. (b)(2). Pub. L. 109–58, §1295(a)(1), substituted "Notwithstanding subsection (f), the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title" for "The provisions of sections 824i, 824j, and 824k of this title" and "Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "Compliance with any order of the Commission under the provisions of section 824i or 824j of this title".

Subsec. (e). Pub. L. 109–58, §1295(a)(2), substituted "section 824e(e), 824e(f), 824i, 824j, 824j–1, 824k, 824*o*, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title" for "section 824i, 824j, or 824k of this title".

Subsec. (f). Pub. L. 109–58, §1291(c), which directed amendment of subsec. (f) by substituting "political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year," for "political subdivision of a state,", was executed by making the substitution for "political subdivision of a State," to reflect the probable intent of Congress.

Subsec. (g)(5). Pub. L. 109–58, §1277(b)(1), substituted "2005" for "1935".

1992—Subsec. (g). Pub. L. 102–486 added subsec. (g).

1978—Subsec. (b). Pub. L. 95–617, §204(b)(1), designated existing provisions as par. (1), inserted "except as provided in paragraph (2)" after "in interstate commerce, but", and added par. (2).

Subsec. (e). Pub. L. 95–617, §204(b)(2), inserted "(other than facilities subject to such jurisdiction solely by reason of section 824i, 824j, or 824k of this title)" after "under this subchapter".

### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by section 1277(b)(1) of Pub. L. 109–58 effective 6 months after Aug. 8, 2005, with provisions relating to effect of compliance with certain regulations approved and made effective prior to such date, see section 1274 of Pub. L. 109–58, set out as an Effective Date note under section 16451 of Title 42, The Public Health and Welfare.

STATE AUTHORITIES; CONSTRUCTION

Nothing in amendment by Pub. L. 102–486 to be construed as affecting or intending to affect, or in any way to interfere with, authority of any State or local government relating to environmental protection or siting of facilities, see section 731 of Pub. L. 102–486, set out as a note under section 796 of this title.

PRIOR ACTIONS; EFFECT ON OTHER AUTHORITIES

Pub. L. 95–617, title II, §214, Nov. 9, 1978, 92 Stat. 3149, provided that:

"(a) PRIOR ACTIONS.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall apply to, or affect, any action taken by the Commission [Federal Energy Regulatory Commission] before the date of the enactment of this Act [Nov. 9, 1978].

"(b) OTHER AUTHORITIES.—No provision of this title [enacting sections 823a, 824i to 824k, 824a–1 to 824a–3 and 825q–1 of this title, amending sections 796, 824, 824a, 824d, and 825d of this title and enacting provisions set out as notes under sections 824a, 824d, and 825d of this title] or of any amendment made by this title shall

limit, impair or otherwise affect any authority of the Commission or any other agency or instrumentality of the United States under any other provision of law except as specifically provided in this title."

## § 824a. Interconnection and coordination of facilities; emergencies; transmission to foreign countries

### (a) Regional districts; establishment; notice to State commissions

For the purpose of assuring an abundant supply of electric energy throughout the United States with the greatest possible economy and with regard to the proper utilization and conservation of natural resources, the Commission is empowered and directed to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy, and it may at any time thereafter, upon its own motion or upon application, make such modifications thereof as in its judgment will promote the public interest. Each such district shall embrace an area which, in the judgment of the Commission, can economically be served by such interconnection and coordinated electric facilities. It shall be the duty of the Commission to promote and encourage such interconnection and coordination within each such district and between such districts. Before establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district, and shall afford each such State commission reasonable opportunity to present its views and recommendations, and shall receive and consider such views and recommendations.

### (b) Sale or exchange of energy; establishing physical connections

Whenever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility (if the Commission finds that no undue burden will be placed upon such public utility thereby) to establish physical connection of its transmission facilities with the facilities of one or more other persons engaged in the transmission or sale of electric energy, to sell energy to or exchange energy with such persons: *Provided,* That the Commission shall have no authority to compel the enlargement of generating facilities for such purposes, nor to compel such public utility to sell or exchange energy when to do so would impair its ability to render adequate service to its customers. The Commission may prescribe the terms and conditions of the arrangement to be made between the persons affected by any such order, including the apportionment of cost between them and the compensation or reimbursement reasonably due to any of them.

### (c) Temporary connection and exchange of facilities during emergency

(1) During the continuance of any war in which the United States is engaged, or whenever

mental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

**(c) Compliance with order of Commission**

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, § 204, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 850.)

**Executive Documents**

Transfer of Functions

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§ 1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

**§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein pro-

vided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

(A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

(B) whether any such clause reflects any costs other than costs which are—

(i) subject to periodic fluctuations and

(ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

(A) modify the terms and provisions of any automatic adjustment clause, or

(B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

(A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

(B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, §205, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, §3006, Oct. 23, 2018, 132 Stat. 3868.)

Editorial Notes

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted "sixty" for "thirty" in two places.
  Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

Statutory Notes and Related Subsidiaries

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

§ 824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

## § 824s. Transmission infrastructure investment

### (a) Rulemaking requirement

Not later than 1 year after August 8, 2005, the Commission shall establish, by rule, incentive-based (including performance-based) rate treatments for the transmission of electric energy in interstate commerce by public utilities for the purpose of benefitting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

### (b) Contents

The rule shall—

(1) promote reliable and economically efficient transmission and generation of electricity by promoting capital investment in the enlargement, improvement, maintenance, and operation of all facilities for the transmission of electric energy in interstate commerce, regardless of the ownership of the facilities;

(2) provide a return on equity that attracts new investment in transmission facilities (including related transmission technologies);

(3) encourage deployment of transmission technologies and other measures to increase the capacity and efficiency of existing transmission facilities and improve the operation of the facilities; and

(4) allow recovery of—

(A) all prudently incurred costs necessary to comply with mandatory reliability standards issued pursuant to section 824o of this title; and

(B) all prudently incurred costs related to transmission infrastructure development pursuant to section 824p of this title.

### (c) Incentives

In the rule issued under this section, the Commission shall, to the extent within its jurisdiction, provide for incentives to each transmitting utility or electric utility that joins a Transmission Organization. The Commission shall ensure that any costs recoverable pursuant to this subsection may be recovered by such utility through the transmission rates charged by such utility or through the transmission rates charged by the Transmission Organization that provides transmission service to such utility.

### (d) Just and reasonable rates

All rates approved under the rules adopted pursuant to this section, including any revisions to the rules, are subject to the requirements of sections 824d and 824e of this title that all rates, charges, terms, and conditions be just and reasonable and not unduly discriminatory or preferential.

(June 10, 1920, ch. 285, pt. II, § 219, as added Pub. L. 109–58, title XII, § 1241, Aug. 8, 2005, 119 Stat. 961.)

## § 824s–1. Incentives for cybersecurity investments

### (a) Definitions

In this section:

#### (1) Advanced cybersecurity technology

The term ''advanced cybersecurity technology'' means any technology, operational capability, or service, including computer hardware, software, or a related asset, that enhances the security posture of public utilities through improvements in the ability to protect against, detect, respond to, or recover from a cybersecurity threat (as defined in section 650 of title 6).

#### (2) Advanced cybersecurity technology information

The term ''advanced cybersecurity technology information'' means information relating to advanced cybersecurity technology or proposed advanced cybersecurity technology that is generated by or provided to the Commission or another Federal agency.

### (b) Study

Not later than 180 days after November 15, 2021, the Commission, in consultation with the Secretary of Energy, the North American Electric Reliability Corporation, the Electricity Subsector Coordinating Council, and the National Association of Regulatory Utility Commissioners, shall conduct a study to identify incentive-based, including performance-based, rate treatments for the transmission and sale of electric energy subject to the jurisdiction of the Commission that could be used to encourage—

(1) investment by public utilities in advanced cybersecurity technology; and

(2) participation by public utilities in cybersecurity threat information sharing programs.

### (c) Incentive-based rate treatment

Not later than 1 year after the completion of the study under subsection (b), the Commission shall establish, by rule, incentive-based, including performance-based, rate treatments for the transmission of electric energy in interstate commerce and the sale of electric energy at wholesale in interstate commerce by public utilities for the purpose of benefitting consumers by encouraging—

(1) investments by public utilities in advanced cybersecurity technology; and

(2) participation by public utilities in cybersecurity threat information sharing programs.

### (d) Factors for consideration

In issuing a rule pursuant to this section, the Commission may provide additional incentives beyond those identified in subsection (c) in any case in which the Commission determines that an investment in advanced cybersecurity technology or information sharing program costs will reduce cybersecurity risks to—

(1) defense critical electric infrastructure (as defined in section 824o–1(a) of this title) and other facilities subject to the jurisdiction of the Commission that are critical to public safety, national defense, or homeland security, as determined by the Commission in consultation with—

(A) the Secretary of Energy;

(B) the Secretary of Homeland Security; and

(C) other appropriate Federal agencies; and

(2) facilities of small or medium-sized public utilities with limited cybersecurity resources, as determined by the Commission.



ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithography, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### Codification

"Sections 1535 and 1536 of title 31" substituted in text for "sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])" on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### Change of Name

"Director of the Government Publishing Office" substituted for "Public Printer" in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

"Government Publishing Office" substituted for "Government Printing Office" in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such ap-

plication is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, § 313, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 860; amended June 25, 1948, ch. 646, § 32(a), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 85–791, § 16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, § 1284(c), Aug. 8, 2005, 119 Stat. 980.)

**Editorial Notes**

Codification

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

Amendments

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, § 16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, § 16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

**Statutory Notes and Related Subsidiaries**

Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

## § 825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

(1) acting as an officer or director of an electric utility; or

(2) engaging in the business of purchasing or selling—

(A) electric energy; or

(B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, § 314, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, § 32(b), 62 Stat. 991; May 24, 1949, ch. 139, § 127, 63 Stat. 107; Pub. L. 109–58, title XII, § 1288, Aug. 8, 2005, 119 Stat. 982.)

**Editorial Notes**

Codification

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

Amendments

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

(i) The Regional Transmission Organization planning and expansion process must encourage market-driven operating and investment actions for preventing and relieving congestion.

(ii) The Regional Transmission Organization's planning and expansion process must accommodate efforts by state regulatory commissions to create multi-state agreements to review and approve new transmission facilities. The Regional Transmission Organization's planning and expansion process must be coordinated with programs of existing Regional Transmission Groups (See § 2.21 of this chapter) where appropriate.

(iii) If the Regional Transmission Organization is unable to satisfy this requirement when it commences operation, it must file with the Commission a plan with specified milestones that will ensure that it meets this requirement no later than three years after initial operation.

(8) *Interregional coordination.* The Regional Transmission Organization must ensure the integration of reliability practices within an interconnection and market interface practices among regions.

(l) *Open architecture.* (1) Any proposal to participate in a Regional Transmission Organization must not contain any provision that would limit the capability of the Regional Transmission Organization to evolve in ways that would improve its efficiency, consistent with the requirements in paragraphs (j) and (k) of this section.

(2) Nothing in this regulation precludes an approved Regional Transmission Organization from seeking to evolve with respect to its organizational design, market design, geographic scope, ownership arrangements, or methods of operational control, or in other appropriate ways if the change is consistent with the requirements of this section. Any future filing seeking approval of such changes must demonstrate that the proposed changes will meet the requirements of paragraphs (j), (k) and (l) of this section.

[Order 2000–A, 65 FR 12110, Mar. 8, 2000, as amended by Order 679, 71 FR 43338, July 31, 2006]

## Subpart G—Transmission Infrastructure Investment Provisions

### § 35.35 Transmission infrastructure investment.

(a) *Purpose.* This section establishes rules for incentive-based (including performance-based) rate treatments for transmission of electric energy in interstate commerce by public utilities for the purpose of benefiting consumers by ensuring reliability and reducing the cost of delivered power by reducing transmission congestion.

(b) *Definitions.* (1) *Transco* means a stand-alone transmission company that has been approved by the Commission and that sells transmission services at wholesale and/or on an unbundled retail basis, regardless of whether it is affiliated with another public utility.

(2) *Transmission Organization* means a Regional Transmission Organization, Independent System Operator, independent transmission provider, or other transmission organization finally approved by the Commission for the operation of transmission facilities.

(c) *General rule.* All rates approved under the rules of this section, including any revisions to the rules, are subject to the filing requirements of sections 205 and 206 of the Federal Power Act and to the substantive requirements of sections 205 and 206 of the Federal Power Act that all rates, charges, terms and conditions be just and reasonable and not unduly discriminatory or preferential.

(d) *Incentive-based rate treatments for transmission infrastructure investment.* The Commission will authorize any incentive-based rate treatment, as discussed in this paragraph (d), for transmission infrastructure investment, provided that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential. A public utility's request for one or more incentive-based rate treatments, to be made in a filing pursuant to section 205 of the Federal Power Act, or in a petition for a declaratory order that precedes a filing pursuant to section 205, must include a detailed explanation of how the proposed

rate treatment complies with the requirements of section 219 of the Federal Power Act and a demonstration that the proposed rate treatment is just, reasonable, and not unduly discriminatory or preferential. The applicant must demonstrate that the facilities for which it seeks incentives either ensure reliability or reduce the cost of delivered power by reducing transmission congestion consistent with the requirements of section 219, that the *total* package of incentives is tailored to address the demonstrable risks or challenges faced by the applicant in undertaking the project, and that resulting rates are just and reasonable. For purposes of this paragraph (d), incentive-based rate treatment means any of the following:

(1) For purposes of this paragraph (d), incentive-based rate treatment means any of the following:

(i) A rate of return on equity sufficient to attract new investment in transmission facilities;

(ii) 100 percent of prudently incurred Construction Work in Progress (CWIP) in rate base;

(iii) Recovery of prudently incurred pre-commercial operations costs;

(iv) Hypothetical capital structure;

(v) Accelerated depreciation used for rate recovery;

(vi) Recovery of 100 percent of prudently incurred costs of transmission facilities that are cancelled or abandoned due to factors beyond the control of the public utility;

(vii) Deferred cost recovery; and

(viii) Any other incentives approved by the Commission, pursuant to the requirements of this paragraph, that are determined to be just and reasonable and not unduly discriminatory or preferential.

(2) In addition to the incentives in §35.35(d)(1), the Commission will authorize the following incentive-based rate treatments for Transcos, provided that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential:

(i) A return on equity that both encourages Transco formation and is sufficient to attract investment; and

(ii) An adjustment to the book value of transmission assets being sold to a Transco to remove the disincentive associated with the impact of accelerated depreciation on federal capital gains tax liabilities.

(e) *Incentives for joining a Transmission Organization.* The Commission will authorize an incentive-based rate treatment, as discussed in this paragraph (e), for public utilities that join a Transmission Organization, if the applicant demonstrates that the proposed incentive-based rate treatment is just and reasonable and not unduly discriminatory or preferential. Applicants for the incentive-based rate treatment must make a filing with the Commission under section 205 of the Federal Power Act. For purposes of this paragraph (e), an incentive-based rate treatment means a return on equity that is higher than the return on equity the Commission might otherwise allow if the public utility did not join a Transmission Organization. The Commission will also permit transmitting utilities or electric utilities that join a Transmission Organization the ability to recover prudently incurred costs associated with joining the Transmission Organization, either through transmission rates charged by transmitting utilities or electric utilities or through transmission rates charged by the Transmission Organization that provides services to such utilities.

(f) *Approval of prudently-incurred costs.* The Commission will approve recovery of prudently-incurred costs necessary to comply with the mandatory reliability standards pursuant to section 215 of the Federal Power Act, provided that the proposed rates are just and reasonable and not unduly discriminatory or preferential.

(g) *Approval of prudently incurred costs related to transmission infrastructure development.* The Commission will approve recovery of prudently-incurred costs related to transmission infrastructure development pursuant to section 216 of the Federal Power Act, provided that the proposed rates are just and reasonable and not unduly discriminatory or preferential.

(h) *FERC–730, Report of transmission investment activity.* Public utilities that have been granted incentive rate treatment for specific transmission projects

351

A - 13

must file FERC–730 on an annual basis beginning with the calendar year incentive rate treatment is granted by the Commission. Such filings are due by April 18 of the following calendar year and are due April 18 each year thereafter. The following information must be filed:

(1) In dollar terms, actual transmission investment for the most recent calendar year, and projected, incremental investments for the next five calendar years;

(2) For all current and projected investments over the next five calendar years, a project by project listing that specifies for each project the most up-to-date, expected completion date, percentage completion as of the date of filing, and reasons for delays. Exclude from this listing projects with projected costs less than $20 million; and

(3) For good cause shown, the Commission may extend the time within which any FERC–730 filing is to be filed or waive the requirements applicable to any such filing.

(i) *Rebuttable presumption.* (1) The Commission will apply a rebuttable presumption that an applicant has demonstrated that its project is needed to ensure reliability or reduces the cost of delivered power by reducing congestion for:

(i) A transmission project that results from a fair and open regional planning process that considers and evaluates projects for reliability and/or congestion and is found to be acceptable to the Commission; or

(ii) A project that has received construction approval from an appropriate state commission or state siting authority.

(2) To the extent these approval processes do not require that a project ensures reliability or reduce the cost of delivered power by reducing congestion, the applicant bears the burden of demonstrating that its project satisfies these criteria.

(j) *Commission authorization to site electric transmission facilities in interstate commerce.* If the Commission pursuant to its authority under section 216 of the Federal Power Act and its regulations thereunder has issued one or more permits for the construction or modification of transmission facilities in a na-

tional interest electric transmission corridor designated by the Secretary, such facilities shall be deemed to either ensure reliability or reduce the cost of delivered power by reducing congestion for purposes of section 219(a).

[Order 679, 71 FR 43338, July 31, 2006, as amended by Order 679–A, 72 FR 1172, Jan. 10, 2007, Order 691, 72 FR 5174, Feb. 5, 2007]

## Subpart H—Wholesale Sales of Electric Energy, Capacity and Ancillary Services at Market-Based Rates

SOURCE: Order 697, 72 FR 40038, July 20, 2007, unless otherwise noted.

### § 35.36  Generally.

(a) For purposes of this subpart:

(1) *Seller* means any person that has authorization to or seeks authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under section 205 of the Federal Power Act.

(2) *Category 1 Seller* means a Seller that:

(i) Is either a wholesale power marketer that controls or is affiliated with 500 MW or less of generation in aggregate per region or a wholesale power producer that owns, controls or is affiliated with 500 MW or less of generation in aggregate in the same region as its generation assets;

(ii) Does not own, operate or control transmission facilities other than limited equipment necessary to connect individual generating facilities to the transmission grid (or has been granted waiver of the requirements of Order No. 888, FERC Stats. & Regs. ¶ 31,036);

(iii) Is not affiliated with anyone that owns, operates or controls transmission facilities in the same region as the Seller's generation assets;

(iv) Is not affiliated with a franchised public utility in the same region as the Seller's generation assets; and

(v) Does not raise other vertical market power issues.

(3) *Category 2 Sellers* means any Sellers not in Category 1.

(4) *Inputs to electric power production* means intrastate natural gas transportation, intrastate natural gas storage

## CERTIFICATE OF SERVICE

I hereby certify that, on June 21, 2024, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney